THE METROPOLITAN BANK *vs.* DURANT and others.

1. Where a debtor has transferred his property to his wife, who holds it for his use, and permits him to control and enjoy it, and he thereby defies and defrauds his creditors, it will not protect him, in a court of equity, that the forms of law have been pursued.

2. No payment of consideration will protect any sale contrived and accomplished to defraud creditors, when the purchaser has knowledge of the sale.

The complainant obtained judgment against the defendant, C. F. Durant, in the Supreme Court of this state, February 27th, 1866, for $10,664.74. To the execution issued on this judgment the sheriff returned that the defendant had no goods or lands. A large amount of real estate which C. F. Durant had owned in 1862, had, by executions on certain judgments against him, been sold to the defendant, J. J. Durant, and by him conveyed to the defendant, E. H. Durant, the wife of C. F. Durant, and are now held by her. The complainant contends that these sales were a fraudulent contrivance between the three defendants to transfer this property to the wife for the purpose of protecting it from the creditors of C. F. Durant, and the bill seeks to set aside these conveyances as against the complainant, and prays that the lands may be sold to pay the debt due the complainant.

The defendants have answered upon oath, as required. They deny fraud and fraudulent intent, but admit most of the facts alleged in the bill from which the court is asked to infer the fraud. The complainant has examined witnesses and produced documentary proofs; the defendants have adduced no testimony.

*Mr. Gilchrist*, Attorney-General, for complainant.

*Mr. B. Williamson*, for J. J. Durant and E. H. Durant.

*Mr. C. F. Durant*, *pro se*.

THE CHANCELLOR.

The facts as admitted or clearly shown, are these : That in 1857, C. F. Durant owned the real estate in question, consisting of twenty-eight lots in Jersey City. They were situate in three distinct and separate parcels, one consisting of twenty-one lots, one of four lots, and one of three lots. They were worth about $100,000, were not encumbered, and he was nearly, if not wholly, free from debt. On one

parcel of these lots were three brick dwelling-houses, in one of which he resided, and in which he continues to reside. He also had a printing office in New York, where he carried on the business of a printer.

In 1857, Arbuckle and Co., a New York firm, assigned their property to him for the benefit of their creditors. He collected out of their assets a large amount of money, more than $60,000, a great part of which he appropriated to his own use. He borrowed two sums of $8000 and $6800, upon two separate mortgages on two of the three parcels of land, which included seven of the twenty-eight lots; with this and moneys received from the assets of Arbuckle and Co., he erected ten brick and two frame buildings on some of the twenty-eight lots; six of these were on the lots not included in the two mortgages. These mortgages were made in July, 1859, and April, 1860, and the buildings were erected about the same time. These buildings cost about the sum of $30,000.

In March, 1859, the complainant, who was a creditor of Arbuckle and Co., commenced a suit against C. F. Durant, as assignee, in the Supreme Court of the state of New York, to enforce the payment of the debt due to it, and the referee in that suit, before whom the proceedings were continued for years, reported to the court in favor of the complainant, and judgment was entered in favor of complainant against C. F. Durant, on that report, in October, 1865, for $10,-341.11; upon this the suit was brought and judgment rendered in the Supreme Court of this state. The referee also, by a report dated July 22d, 1863, reported that the defendant had been guilty of violations of the trust under the assignment, and had appropriated moneys collected by him to the payment of his own debts, and that there was in his hands moneys of the trust to the amount of $48,684.29, with interest on it from May 1st, 1863, applicable to the payment of the creditors of Arbuckle and Co. Upon this report judgment was rendered in the Supreme Court of New York, September 30th, 1863, one part of which was, that the de-

fendant, C. F. Durant, should pay that sum and the interest thereon to a receiver appointed in that suit.

In July, 1860, the referee in the suit in New York, determined, upon argument, that Durant was liable to account to the plaintiff in that suit. This was the first decision in it. Soon after this, in 1860 or 1861, C. F. Durant disposed of his printing establishment in the city of New York, and from that time went seldom to the city, and after the assignee's report, refrained from going to the city, with intent, as he declares in his answer, to compel the complainant to transfer the litigation to New Jersey.

On the 4th of June, 1861, Charles Palmer recovered a judgment against C. F. Durant in the Supreme Court of this state, for $1800, in an action on the case; this suit was contested by Durant; he removed it to the Court of Errors, where the judgment was affirmed; after which an execution against goods and lands was issued on this judgment, tested April 8th, 1862. On the 11th of April, 1862, a judgment was entered in the Supreme Court by confession, against C. F. Durant, in favor of his brother, the defendant, J. J. Durant, for $11,672, and a *fieri facias de bonis et terris* was issued upon that judgment the next day. On that day the sheriff of Hudson advertised that he had levied on the three parcels of land in question, and would sell them on the 12th of June, exactly two months from the teste of the execution of J. J. Durant. The advertisement was inserted in a paper published at Hoboken, and not in any paper in Jersey City, where the lands were situate, and was preceded by the universal declaration, "subject to prior encumbrances," "value one dollar." The property was, in fact, worth considerably over $100,000, and the only encumbrances were the two mortgages for $14,500.

The property was sold by the sheriff on the day advertised. C. F. Durant was not at the sale. J. J. Durant attended, and the whole property was struck off to him for $10,000. The whole twenty-eight lots in the three parcels, were put up in one lot and struck off at one bid. There is no direct

proof of this. But it is so charged in the bill and not denied in the answer, and may be well taken as confessed. And the recital in the sheriff's deed states one offer, one bid, and one striking down; and this recital, uncontradicted, is proof that the whole premises were struck off at one bid.

The sheriff's deed was dated on the 16th, and acknowledged on the 19th of June, 1862. On the 18th of June, 1862, J. J. Durant, in pursuance of an arrangement made before the sale, borrowed $2300 of the executors of L. Gordon, on the security of a mortgage upon one of the twenty-one lots not included in the two prior mortgages, and out of this the Palmer judgment, and the costs and expenses of the confessed judgment, and in part of the Palmer litigation, were paid.

C. F. Durant continued in possession of the property after the sale, and from then until now, renting the houses, collecting the rents, and appropriating them to his own use, after paying the taxes. J. J. Durant, by deed dated July 13th, 1866, recited to be in consideration of $60,000, conveyed the whole property in fee to E. H. Durant, the wife of C. F. Durant, subject to the three mortgages above mentioned.

No consideration was paid to J. J. Durant for this conveyance, but a mortgage without a bond was executed by E. H. Durant to him to secure $60,000. This was given on a small fraction of this property, a triangle of sixty feet perpendicular, and thirty feet base, fronting on Newark avenue, which the city authorities were. about to take to extend Montgomery street; it contained little more than one-third of a lot. The property by itself was not worth $60,000, or one-fourth of it, but it was supposed, or at least alleged, that the city would have to pay off the mortgage to authorize them to take the property. The taking of this strip cut off the fronts of three new brick houses, and part of the front of a fourth, and left all four open in front and untenantable.

After this the city authorities opened Montgomery street, and about $20,000 was awarded for the land taken and

damages ; this amount was paid to J. J. Durant by a check which he handed over to C. F. Durant; none of the proceeds were ever paid to him, and he never received any consideration whatever for his conveyance to E. H. Durant, and has no security or obligation for it.

C. F. Durant has always since then, collected the rents and appropriated them, and kept no account of them. For several years, when these rents amounted to several thousand dollars, he has, in his return to the internal revenue collectors, stated that his wife had no income whatever. He employed the counsel in this suit for J. J. Durant and E. H. Durant, and has attended to the litigation in person. He has, pending this suit, erected a large and expensive building, known as the Kepler Market, upon part of the tract of twenty-one lots.

The consideration of the judgment confessed to J. J. Durant does not distinctly appear. The answer on this head is vague, evasive, and unsatisfactory. The story to be gathered from it is this : That in 1841 C. F. Durant owned some land somewhere on Bergen Hill. J. J. Durant, to relieve the *immediate necessities* of C. F. Durant, verbally agreed to purchase it for a price not stated, and which was to be paid by instalments in amounts and times not disclosed. No deed or written agreement of sale was executed. In January, 1853, C. F. Durant and wife conveyed this tract to *some one* not named, for $7,250, which was secured by mortgage. This mortgage was to C. F. Durant, and the money was paid to him in 1856. He omitted to pay this money to J. J. Durant when received. For this amount, and the interest thereon in April, 1862, by the advice of E. H. Durant, it was arranged to confess a judgment to J. J. Durant, for the purpose of saving the whole property from being sacrificed by the Palmer judgment.

Here, then, is exhibited a debtor who, in 1857, owned real estate worth $100,000, and unincumbered, and which, without regard to the improvements, is now worth nearly double that sum ; and on which there is now no bona fide encum-

brance, except the Gordon mortgage, that is not fully represented by buildings since erected on the property. This debtor in 1857 accepted an assignment of the effects of a large business firm in New York, out of which he has collected and appropriated to his own use over $48,000, much of which was expended in improvements on this property.

This property, by the machinery of a sheriff's sale got up by this debtor, his wife and brother, upon an adverse judgment, transferred to friendly hands, and a judgment confessed for the purpose to his brother, has become vested in the wife of the debtor, who has never paid one dollar of consideration, and never had any means to pay, except her inchoate dower and the assumption of mortgages not one-tenth of the value of the property; and she holds it for his use and permits him to control and enjoy it, and put at defiance his creditors, including those whose money, in breach of his trust, he appropriated to erect the buildings upon it.

It would be a disgrace to our courts if they could not give a remedy against fraud and abuse of trust like this. That the forms of law have been pursued is no protection in a court of equity, if the result aimed at and reached is a fraud. The Palmer judgment was a legal claim against Durant, which he had to pay, and which had a preference over creditors at large. He could have been paid it at any time by money raised on the security of one-twentieth of this property, as the money actually used for its payment was eventually raised by the Gordon mortgage.

All pretence that this large property was in any danger of being sacrificed by that judgment is mere trifling, and when set up in an answer, under oath, is calculated to prejudice the parties who have ventured to swear to it. The reason for the confession of judgment to J. J. Durant, and the story of its consideration, are both suspicious. It is claimed to have been devised to save the sacrifice of the real estate. It is not pretended that it was to obtain for J. J. Durant the payment of his debt. He did not use it for that purpose. When the money got by means of the mortgage

that was the alleged consideration of the sale, was put in his hands, nearly double his pretended debt, he handed the whole back to Charles, without putting a dollar to his credit, or in his pocket. The story of the consideration is most extraordinary, vague, and incredible, avoiding all particulars by which its truth could be tested, and savors so much of fiction and fraud, that it is difficult, if not impossible, to compel the mind to believe it.

But if this claim were ever so just and clearly established, this judgment has been so used, and this sale has been managed and conducted so clearly for the purpose of placing the property of C. F. Durant beyond the reach of his creditors, that it could not be sustained. No payment of consideration will protect any sale contrived and accomplished to defraud creditors, when the purchaser has knowledge of the object of the sale.

The defendant, E. H. Durant, is neither a purchaser for a consideration or without notice. She was party to the scheme. She advised the confession of the judgment to J. J. Durant. and she has not paid one dollar for the property. At the suit, the Palmer judgment was in the hands of a friend. The execution of J. J. Durant was put in the sheriff's hands, and the property advertised on the very day of its teste. Such extraordinary haste was not necessary to make a fair debt out of property of more than ten times the value required. The unusual prefix to the advertisements may possibly have been the work of the sheriff, but the evident tendency to aid the object in view, or supposed to be in view, and the absence of any other object, makes it probable it was a part of the fraudulent scheme. The fact that C. F. Durant did not attend a sale in which $100,000 worth of property might be and was sold for $10,500, a result which his presence would certainly have avoided, shows to my mind conclusively, that the sale was a fraud, and not for the purpose of making the debts. Any one house and lot would have brought the amount of the Palmer judgment; any two of them ought to have brought the amount of the judgment

of J. J. Durant. There were thirteen lots, with brick houses on them, of this value. The defendant was entitled to have these lots sold separately, and the sheriff, upon his request, was bound so to sell them, and would have sold them separately. He must be taken to have known this. The sale in one parcel, of three tracts which did not adjoin each other, and each of which was of the value of both judgment debts, was an abuse which must have been apparent to the sheriff and all parties concerned; and it is but fair to the officer to presume that he would not have committed it, except by instruction. The defendant, unless he had consented, could have had the sale set aside if he had applied. And it is impossible to believe that after such a sacrifice, when it came to his knowledge, he would not have applied to set it aside if it was not a scheme concocted between him and the purchaser.

The indicia of fraud that surround this whole transaction, make the conclusion inevitable, that this sale was not for the purpose of making the money due on these judgments, but to vest the title of this property in the brother and wife of C. F. Durant, to enable him to put his creditors at defiance.

In this case the fraud is so apparent on the whole proceeding, and so little effort has been made to conceal the object in view, that it seems superfluous further to go over the details of the case to point out the evidences of the fraudulent intent. The complainant is entitled to the relief asked for in the bill.